HENRY M. FLOYD, EXECUTOR, ET AL. *v.* KITTY DENNY CALVERT.

1. MARRIAGE. *When valid. By consent. Evidence.*

   No civil or religious ceremonies of any kind are essential to constitute a valid marriage. It may be created by consent of parties *per verba de presenti*, followed by cohabitation thereunder; and its existence may be shown by the acts and declarations of the parties.

2. SAME. *Sect. 22, art. 12, Constitution. How applied.*

   Under § 22 of art. 12 of the State constitution, those only shall be taken and held for all purposes in law as married who were, at the instant of the ratification of the constitution, living and cohabiting together as husband and wife, and willingly and actually recognizing each other as husband and wife, and desiring and intending that that relationship should subsist between them.

3. SAME. *Sect. 22, art. 12, Constitution. Its acceptance. How indicated. Proof.*

   Where a person claims to be married, under § 22, art. 12, of the State constitution, there must be shown some formal and explicit agreement between the parties that they will and do accept the new organic law as establishing thenceforward between them a new relationship, or there must be such open and visible change in the conduct and declarations of the parties, that an agreement to accept the new law might fairly be inferred.

4. SAME. *Illegal union once established. Presumption.*

   When persons, originally at liberty to form a legal or an illegal union, as they prefer, elect the criminal in preference to the lawful relationship, they must be presumed to have continued therein, until some change of intention and wishes is affirmatively shown.

5. SAME. *Sect. 22, art. 12, Constitution. Its effect.*

   The most that such an enactment as § 22, art. 12, of the State constitution could accomplish, would be to offer to persons living together in an unlawful relationship the opportunity of legalizing their union without the necessity of a formal marriage.

APPEAL from the Chancery Court of Warren County.

Hon. EDWIN HILL, Chancellor.

On the twenty-fourth day of January, 1874, George S. Calvert died in the city of Vicksburg, Warren County, leaving a considerable estate in lands and personalty, which he disposed of by last will and testament. In February following, Kitty Denny

Calvert filed her petition in the Chancery Court of said county, claiming to be the lawful wife of said George S. Calvert, and praying the court to have her dower in the lands of the deceased set aside to her, according to law.   At the January Term, 1875, of said court, the petitioner, by leave, filed an amended and supplemental petition, alleging that she had borne several children, to the deceased, one of whom was then living, was a minor, and was his legitimate child ; and she asked the court to make an allowance to her and her said child, under our statutes, for one year's support out of the decedent's estate.   Henry M. Floyd, the executor of the decedent's will, and others interested, answered the petition, denying that the petitioner was the lawful wife of George S. Calvert, or that she had ever been, in any way, married to him according to law.

On the 31st of July, 1875, the court rendered a decree making an allowance for one year's support for the petitioner and her said minor child out of the estate of the decedent ; from which decree the respondents appealed to this court.   It was not claimed by the petitioner that there was ever any religious ceremony, or legally prescribed form, of marriage between her and the deceased.   But she claimed that, by their mutual consent, their manner of living together, and its consequences, and by operation of § 22 of art. 12 of the State constitution, they became, in law, husband and wife.   The other facts of the case, and the material evidence, are fully set forth in the opinion of the court.

The only material assignment of error in the court below by the appellants was that the court erred "in decreeing appellee to be the widow of George S. Calvert, and Mary Jane Calvert his legitimate child, and in allowing a year's support for appellee and her child."

*Adam* and *Speed*, for the appellants.

1. Marriage has its origin and foundation in a purely civil contract, which is both stipulatory and consensual, and cannot be valid without the spontaneous concurrence of two competent minds.   One of its essential requirements is the consenting mind of each party to the contract giving his consent in fact to the marriage.   The principle of law, in cases where no formal solemnization of marriage has been had, that permits this con-

sent to be proved by the acts and conduct of the parties during cohabitation, has been generally engrafted upon our American jurisprudence, and recognized by our highest tribunals in this state. How far has this principle, in its application to the present case, been restricted, enlarged, modified, or affected by our laws or constitution?

2. The termination of the late civil war found a large number of those who had been slaves, and lately acquired the rights of citizenship, in an anomalous condition with regard to the marriage relation. The slaves could not enter into a contract of marriage. The presumption arising from cohabitation and consent, which often controlled the *status* as to the marriage of free white persons, did not affect the newly enfranchised slaves, even when the fact of marriage had existed for half a lifetime. There is some difference of opinion as to the effect of cohabitation after emancipation (see *Girod* v. *Lewis*, 6 Martin, 559); but the opinion of the Supreme Court of North Carolina, in *Howard* v. *Howard*, 6 Jones, 235, seems to be in consonance with the rulings of this court. But so important a matter could not be left in doubt. Therefore, the framers of our present State constitution enacted the twenty-second section of the twelfth article of the constitution of 1869, embodying in our written organic law, for the especial benefit of the enfranchised race, a principle of law which had before been applicable to other citizens, and which, by its retroactive effect, established the domestic relations of thousands of families, and legitimated their offspring.

3. The principle referred to is held in severe reprobation in many Christian states, and carries the presumption in favor of marriage to an extreme that, in the minds of many, endangers the very existence of the relation which it attempted to protect. To suppose that the framers of our constitution intended to enlarge the presumptions in favor of marriage; restrict or lessen the facts always before considered necessary to raise that presumption; do away with the essential fact of consent; establish the marital relation by cohabitation alone; reverse the ancient maxim, and declare that *cohabitus non consensus facit matrimonium*, — is to say that they intended to degrade the institution of matrimony, deprive the marriage tie of the

sanctity it has acquired even among heathen nations, and obliterate every distinction between marriage and concubinage. The rights of the petitioner in this case must, therefore, be determined by the law and rules of evidence in force before the adoption of the constitution of 1869. These views are substantially adopted by this court in *Dickerson* v. *Brown*, 49 Miss. 357, and *Rundle* v. *Pegram*, 49 Miss. 751. As to the question of marriage, see 1 Greenl. Evid. § 103; 2 id. § 462.

4. Although *semper presumitur pro matrimonio*, the exception to this rule must not be overlooked, that, when the inception of the intercourse was illicit, the presumption will be that the relation continued as it began; and this presumption the petitioner must rebut by proof of a distinct consent to a change in the relation. There can be no doubt that this rule applies to the case at bar. *Rundle* v. *Pegram*, 49 Miss. 756, 757. Do the facts of the case show that the parties, in the language of this court in *Rundle* v. *Pegram*, "jointly accepted the constitution as enabling them to assume the conjugal relation?" "Such an act implies a mutual consent, which must be actual and *bona fide.*" *Rundle* v. *Pegram*, *ubi supra.*

*Morris* and *Shelby*, for the appellee.

1. The decision of the Chancellor having turned upon the testimony upon pure matters of fact, his decision is preeminently correct, — somewhat in analogy to the verdict of a jury, — and must stand, unless opposed by the weight of evidence. *Davis* v. *Richardson*, 45 Miss. 510; *Apple* v. *Ganong*, 47 Miss. 189; *Partee* v. *Bedford*, 51 Miss. 90.

2. Marriage is a relation depending and founded upon civil contract or assent. If the agreement or assent exists, followed by or coupled with the relation, or, in other words, by a living together and cohabiting as man and wife, no matter for how brief a period, the parties can never again, of their own volition, recede from those facts, and so escape their legitimate results; nor can they nullify the contract, assent, or relation. *Dickerson* v. *Brown, ubi supra; Rundle* v. *Pegram, ubi supra.* We submit that this case comes clearly within the principles laid down in the cases of *Dickerson* v. *Brown*

and *Rundle* v. *Pegram.* Tested by those two cases, the marriage is a valid one, and the child legitimate. To prove a contract of marriage, it is not necessary to show that it was made in conformity to the forms and usages of society, or religious sects. The solemnization of the contract by religious ceremony, or in the forms prescribed by law, is not essential. It is susceptible of being established, like any contract : by actual proof of those who heard it ; by the admissions and conduct of the parties to be affected by it ; by mutual assent to the marital relation, coupled with or followed by cohabitation, &c. *Dickerson* v. *Brown, ubi supra.*

3. We do not claim that recognitions of the petitioner as his wife, by Calvert, alone made her his wife. True, they might be regarded as so many consents, made *in presenti ;* but we claim that they were far more than that. Made as they were at different times and under different circumstances, and almost every day during the whole period of their union, and accompanied as they were by continual cohabitation, every recognition of the sort would of course be a consent, even if they stood alone ; but as it was, they were evidence that the consent had been made at the beginning, or at least long before. At what precise date is wholly immaterial to this inquiry. And a marriage of this sort requires no length of time : it may become as complete in one hour as in ten years.

4. In the language of the Supreme Court in *Dickerson* v. *Brown, ubi supra,* " these parties were cohabiting before the time of the adoption of the present constitution," and, " with a knowledge of its provisions, they mutually assent to the relations of marriage."

CHALMERS, J., delivered the opinion of the court.

Shortly after the capture of Vicksburg by the Federal army in 1863, there came to that city an active, resolute, and industrious young Irishman, by the name of George Calvert, who, though destitute of means, and of but limited education, was much above the ordinary class of Irish laborers. His character was marked by a high degree of personal and family pride ; but, while endowed with many excellent quali-

ties, his usefulness was marred by a propensity to strong drink, which ultimately shortened his life. He took service as a civilian employé in the office of the post quartermaster, and was here soon brought in contact with Mrs. Kitty Denny, a young widow of the same nationality with himself, who, with her little daughter Nellie, a child of four or five years of age, had recently arrived in the city, in search, as she alleged, of an uncle who was in the Confederate army. She had come down the river with a detachment of Federal troops, and was said to have acted as cook for a mess of officers at Columbus, Kentucky.

She was prepossessing in manners and appearance, was some years younger than Calvert, and was perhaps his equal in point of education. It is worthy of remark, since some importance is sought to be attached to the fact, that she was nominally a Catholic, while Calvert was to the same extent a Presbyterian, and imbued with that strong antipathy to Catholicism so often found among Irish Protestants. An intimacy at once began between the parties, which, whatever shape it may subsequently have assumed, was undoubtedly illicit and criminal in its inception. Calvert opened a boarding-house for the employés in the quartermaster's department, and Mrs. Denny took charge of it as housekeeper. After the cessation of hostilities, he became a contractor under the city government, in the opening of streets, cutting down of embankments, filling up of ravines, and other work of a similar character, employing in his business many carts, animals, and laborers, besides a superintendent, or " boss " workman. His employés boarded with him, and Mrs. Denny continued to act as the female manager of the household. The connection lasted for more than ten years, and was terminated only by his death in 1874. Four children were born during its continuance, two of whom survived their birth only a few days. One lived to be four years of age, and, being a girl, received from him the name " Georgie," as being the feminine approximate to his own. When she died, he was deeply grieved, gave to her remains a costly funeral, and had them interred in a lot which he had purchased in the city cemetery; but upon the tombstone erected above them was inscribed, by his direc-

tion, the name " Georgie Denny." The other child survived him, and was in its ninth year at the time of his death. It was named Mary Jane, as is alleged, after his favorite sister, but seems from the record to have been generally known only as " Mollie," without the addition of any surname. For her Calvert always evinced the tenderest affection, addressed her as daughter, and was addressed by her as father, or " papa."

He seems, in his business operations, to have been thrown in contact with, and to have won the friendship of, the community at large, numbering among his intimate friends many of the leading citizens of the town ; but with their families he had no acquaintance : and, though he was of a highly convivial turn, and frequently entertained parties of gentlemen at his house, it is not shown that any lady ever visited there, or that Mrs. Denny ever called upon or was visited by any lady whatever, save one. He amassed considerable property, and died in 1874, of pulmonary disease, superinduced by the excessive use of intoxicating liquors. By his last will and testament, executed a few days before his death, he left all his property to his brothers and sisters residing, some in America, and some in Ireland. The appellant was appointed, and duly qualified, as his executor.

Shortly thereafter, the appellee, styling herself Kitty Denny Calvert, and claiming to be the widow of the deceased, filed her petition, praying for the setting aside to herself and child of a year's allowance, under the statute, from the estate. After a protracted litigation, and the taking of an immense mass of testimony, the Chancellor rendered a decree in her favor ; from which decree the executor appeals.

It will be seen that the case turns upon the question whether, by consent of parties, by operation of law, or in any other manner, the matrimonial relation had been established between the petitioner and the decedent.

The claim, upon her part, is rested upon two grounds : 1st, that there was a valid common-law marriage by consent, which is all that is required in this state ; and, 2d, that there were such relations existing between them at the date of the adoption of our present constitution, and such acceptance by them of the provisions of the twenty-second section of the twelfth

article of that instrument, as transformed their previous illicit intercourse into lawful wedlock.

The requirements necessary to constitute a valid marriage in this state have heretofore undergone such exhaustive discussion, and have been so definitely settled by this court, that we deem it unnecessary to do more than reiterate that no civil or religious ceremonies of any kind are essential, and that the matrimonial relation may be created by consent of parties, *per verba de presenti*, followed by cohabitation thereunder, and that its existence may be shown by the acts and declarations of the parties. *Carson* v. *Carson*, 40 Miss. 349; *Hargroves* v. *Thompson*, 31 Miss. 211; *Dickerson* v. *Brown*, 49 Miss. 357; *Rundle* v. *Pegram*, 49 Miss. 752.

In the attempt to show that this relationship existed between the deceased and the petitioner in the case at bar, a mass of testimony was taken, which it is impossible, and would, perhaps, be unprofitable, to abridge or analyze. We must content ourselves with saying, on this branch of the controversy, that, while there are not wanting some strong circumstances tending to show a marriage, the overwhelming weight of the testimony is on the other side, and seems plainly to indicate a continuance, up to the adoption of our present constitution, and, indeed, for some years thereafter, of that meretricious alliance into which, confessedly, the parties originally entered. This being so, it is manifest that neither the adoption of § 22 of art. 12 of that instrument, nor the continued cohabitation of the parties thereafter, could have wrought any change in their relations, against their wishes and without their consent. The section, indeed, makes no reference to any future action upon the part of those intended to be embraced by it, but speaks only of those " who have not been married, but who are now living together, cohabiting as husband and wife ; " meaning, of course, those who were so living and cohabiting at the instant of its ratification. It is these only whom it declares " shall be taken and held for all purposes in law as married ; " and even of these, it applied only to such as were at the time willingly and actually recognizing each other as husband and wife, and desiring and intending that relationship to subsist between them. *Rundle* v. *Pegram, ubi supra.*

But, while it is true that the constitution refers alone to persons who, at the date of its ratification, fell within the description there indicated, and specified no conduct or action in the future as of itself producing the matrimonial relation, it is doubtless true, also, as indicated in the case of *Rundle* v. *Pegram*, that there might be such affirmative acceptance of its provisions, upon the part of those previously living in confessed adultery, as would create a new and legal connection between them.

This, however, is, after all, only saying that those who have been living in adultery may convert their connection into marriage, without the solemnization of matrimonial rites ; and the only effect, therefore, that the adoption of the constitutional provision could have, would be, perhaps, to dispense in some degree with the strictness of proof required. We speak, of course, of cases where there existed no legal impediment between the parties, which was, by the constitution, removed. If, for instance, at the date of the adoption of that instrument, two persons were living together in confessed adultery, between whom there existed some lawful impediment to marriage, which was swept away by the constitution, then, perhaps, a subsequent continued cohabitation after its adoption might of itself be a strong circumstance to show an acceptance of its provisions, and a desire to assume towards each other a new and lawful relationship. But where such condition of concubinage existed between persons as to whom there was no lawful obstruction to matrimony, and who must therefore be considered as having voluntarily elected the unlawful connection, it is difficult to see how a claim of subsequent marriage can be made out under the section in question, by any proof short of that which would establish it in the absence of the provision.

Manifestly a mere continuance of the illicit intercourse would not be sufficient. There must be shown either some formal and explicit agreement between the parties, that they will and do accept the new organic law, as establishing thenceforward between them a new relationship (and this would fall but little, if at all, short of creating a marriage without the constitutional provision), or there must be such open and

visible change in the conduct and declarations of the parties that an agreement to accept the new law might fairly be inferred.

It is a principle of universal acceptance, that while much will be presumed in favor of a marriage, after the removal of the barrier between parties who have been prevented from contracting it by a legal obstacle, no such presumptions will arise where the parties were originally at liberty to form a legal or an illegal union, as they preferred. In such a case, having originally elected the criminal, in preference to the lawful, relationship, they must be presumed to have continued therein, until some change of intention and wishes is affirmatively shown. Bishop on Marriage and Divorce, § 72.

It cannot be pretended that this change could be effected by any legislative or constitutional enactment. The most that such an enactment could accomplish, would be to offer to them the opportunity of legalizing their union, without the necessity of a formal marriage. They must, however, unmistakably signify their desire and intention of accepting the offer, either by an express mutual agreement to that effect, or by such changed conduct towards each other and the public, that such an agreement may be presumed to have taken place.

As before remarked, evidence that would meet the requirements of either branch of this proposition would doubtless be sufficient to establish a good marriage, under the laws of this state, without regard to the constitutional provision.

In the case at bar, the attempt is, to show an express mutual acceptance of the provision in question, and an agreement that the same should operate as effecting a matrimonial union.

There is no effort to prove that any outward, visible sign of this altered condition of affairs was thereafter perceptible to observers, or that there was in fact any change in the conduct, language, or mode of life of the parties. There are, indeed, a number of witnesses who depose that the parties had always occupied the relation of husband and wife to each other ; but they do not pretend that there was any difference observable after the occurrence of the alleged marriage, by acceptance of the constitutional provision ; and, as we are of opinion that

their testimony in affirmance of a previous nuptial condition is overborne by the testimony in negation of it, we will turn our attention to the testimony in support and in denial of a marriage by agreement, under the twenty-second section of the twelfth article of the constitution of 1869, leaving out of view all evidence as to facts or conduct previous to July or August, 1872, at which date the agreement is said to have been entered into.

The statement of Nellie Denny, daughter of the petitioner by her former husband, is, that in July, 1872, Mrs. Denny abandoned Calvert's house, because he refused to have a marriage ceremony performed between them by a Catholic priest, he insisting that it should be performed by a Presbyterian clergyman; that she went to the house of a Mr. Garvin, and took service there; that Calvert sent messages to her to return, and after the expiration of about two weeks went for her in a carriage, accompanied by the witness; that he said to her, in the witness' presence, that if she would return to his house he would show her something that would please her; that thereupon the petitioner went back with them in the carriage, and, on their arrival at home, he pointed out to her a passage in a law-book, and then read it aloud, and told her that that was a marriage by law. A copy of the acts of the legislature of this state, of 1870, being produced, the witness identified it as being the selfsame volume, and pointed out § 22 of art. 12 of the constitution as being the passage read aloud; and, calling attention to the fact that the leaf upon which the section occurred showed marks of having been turned down, declared that it was so turned down at and before its production on the occasion referred to. On the fly-leaf of this volume were written the words: "To George Calvert, Esq., with compliments of J. S. Morris, Dec. 14, 1870." The witness further testified that this book had been brought home from Jackson, by Calvert, some years before, and that it remained continuously thereafter in his wardrobe until his death.

Carter Williams, a colored servant of Calvert's, who lived with him for many years preceding and at the time of his death, and to whom a bequest was made in his will, testified that, while the petitioner was at Garvin's, Calvert told

him to go and tell her that if she would return "he would show her something that would do her good," and that a few days thereafter Calvert himself brought her home in a carriage.

Hon. J. S. Morris, ex-Attorney-General, and counsel for the petitioner in this case, testified, that some time in the year 1870, Calvert, being in Jackson, called to see him, and the conversation turning on an act of the legislature, then recently passed, which had for its object the legitimization of the natural children of a mutual acquaintance resident in Vicksburg, Calvert asked if the passage of such an act was necessary. Morris stated that it was not. After some further conversation, Morris produced a copy of the acts of 1870, with which the constitution was bound up, and pointed out the section referred to. Calvert said that that was what he had wanted to see. Morris asked him if he had a case like that. He replied in a joking and evasive manner, but, while declining to talk about his own case, seemed greatly interested in the constitutional provision. He begged a copy of the book; but declined to take a pamphlet copy which Morris offered him, desiring a bound volume. He accepted, however, a small pamphlet copy of the constitution alone, in which Morris marked the section in question, and he exacted a promise from Morris to send him a bound copy of the acts of 1870, as soon as it could be procured. On the 14th of December, 1870, Morris procured a bound volume, in which he wrote the presentation inscription noticed above, and prepared it for mailing, but neglected to transmit it. It remained in his office for six months or more. Being in Vicksburg in the mean time, he met Calvert, who complained that the book had not been sent. Morris again asked him if he had a case like that provided for in the constitution, and he replied that he had a friend who had. Finally, Calvert, being in Jackson again, called at Morris's office, and got the book, which Morris fully identifies as being the one produced at the hearing, and deposed to by Nellie Denny as having been kept in the wardrobe. Morris, however, contradicts her as to the possibility of the leaf having been turned down on or before the occasion when the petitioner came back from Garvin's, in August, 1872, by stating that he himself turned it

down after Calvert's death, and a short time before he testified in the case.

J. R. Barbour, a civil engineer and personal friend of Calvert's, states that he was with him in Morris's office, and saw the book presented, but did not hear the conversation detailed by Morris. There were other gentlemen in the office, and there were two rooms. His statement is irreconcilable with Morris's in some respects. He says that the bound volume of acts of 1870 was that day delivered, and that he himself brought it away, wrapped up with some books which he purchased from Morris, and he fixes the day as being the 14th of December, 1870, by the inscription and date which he wrote in his own books. Morris, it will be remembered, stated that the book presented to Calvert, and in which, on 14th December, 1870, he wrote the presentation inscription, remained in his office for many months thereafter, and was finally taken off by Calvert in person. These discrepancies, however, are not material. Barbour further testified that, about six months before Calvert's death, he, the witness, warned the deceased that he was likely to kill himself soon by drink; that thereupon Calvert commenced to talk about his little daughter Mollie, the child of the petitioner, became much affected, and said that he wanted to leave her all of his property. Barbour advised him to procure the passage of an act of the legislature legitimatizing her; but from this Calvert seemed to shrink on account of its publicity. He then called a carriage, and, taking Barbour with him, drove to his house, and, producing the book, pointed out the passage of the constitution, and remarked, " that that covered the whole thing." A considerable conversation ensued, in which Calvert seemed impressed with the idea that the constitution made full provision for the child.

Barbour testified that they subsequently had another conversation on the same subject, of similar tenor. He contradicts Nellie Denny's statement, that the book was kept locked up in the wardrobe, by stating that it was kept lying on the centre-table, and was almost the only book in the house. The book itself, when produced, showed considerable wear and hard usage, and thus negatives the statement of Nellie Denny, that it was always carefully kept in the ward-

robe as something sacred, and as affording some sort of muniment of the marriage, by acceptance of the constitutional provision which had taken place, as she alleges, upon the return from Garvin's.

A. W. Brien, a lawyer, testified that, in October, 1872, or 1873, he went with Calvert to Washington City. While there and on the trip Calvert spoke several times of his family in Vicksburg, and upon one occasion excused himself from a carriage-ride, upon the ground that he wanted to write to his wife.

There was much other testimony adduced by the petitioner, tending to show a common-law marriage ; but it is believed that the foregoing constitutes the principal part, if not of all, of that portion intended to establish a mutual acceptance of the constitutional provision, whereby it is claimed that the previous connection, if theretofore illicit, was changed into matrimony.

Of this testimony we may remark that it depends mostly upon the credit to be given to the statement of Nellie Denny. If that statement can be relied on, strongly corroborated as it is by those of Morris and of Barbour, it may be said that the requirements of the case have been fairly met.

The relationship which she bears to the petitioner, and the strong interest she must necessarily feel in the result, warn us that her testimony must be weighed with care, and must be tested by its own inherent probability, and by the other known facts in the case.

A very great number of witnesses, embracing those who were confessedly Calvert's most intimate and confidential friends, testify in the strongest language that there was nothing between the parties, either before or after the return of the petitioner from Garvin's in 1872, that bore the appearance of a marriage, save their living and cohabiting together, and that this was in no respect different after that event from what it had been before; that he never addressed her as " wife," or as " Mrs. Calvert," but always as " Mrs. Denny," or " Kitty," and that she always spoke of and to him as " Mr. Calvert ; " that she was rarely presented or introduced to any one calling at the house, and, if so, always as " Mrs. Denny ; " that she never sat at the table

with him, but frequently waited on it while he and his guests ate ; that this had always been their manner of life, and that there was no change in it after the return from Garvin's ; that they never visited or went out together, or attended church, or the theatre, or any public place, in each other's company.

Edward Miner, after testifying that Calvert always spoke of the petitioner as " Mrs. Denny," or " my house-keeper," stated that on one occasion, after the return from Garvin's, he was present when an acquaintance asked Calvert " how Mrs. Calvert was." He flew into a violent rage, struck at his questioner with a loaded whip so violently as to make an indentation in the wall, and, cursing him, desired to know how he had the impudence to speak of Mrs. Denny as Mrs. Calvert.

E. W. Wallin, ex-mayor of the city, always heard Calvert speak of the petitioner as Mrs. Denny, or as his house-keeper. Four or five months before he died, the witness advised him to marry Mrs. Denny. He emphatically declared that he never would do so. About a year before his death he told the witness that he had had a difficulty with his house-keeper, and had discharged her. Witness advised him to settle up with her, and have a final separation. He said that he intended to do so, and intended also to provide for his child. Two or three years before he died, he spoke of having conceived a fancy for a Miss Bowman, and said that he intended to court her. All of this was after August, 1872, except, perhaps, the conversation about Miss Bowman.

Herman Denio testified, that, being at Calvert's house after the return of the latter from a trip to Ireland in 1873, the latter wished to offer to the witness and some other friends some very fine ale, which he had brought back with him. Not finding it where it had been placed, he called upon his house-keeper (the petitioner) for it, and, because it was not instantly produced, he flew into a violent rage with her, and cursed and abused her. When witness remonstrated with him on this conduct, he avowed, with an oath, that he paid her for managing his affairs, and that if she did not do it he would discharge her, and get somebody that would. She made no reply.

John A. Klein was Calvert's banker. When the latter went to Ireland, in 1873, he made arrangements with the witness to supply his foreman, Kennedy, with money to carry on his business, during his absence, which the witness did. Calvert said nothing about having any family, or any thing to be furnished them.

John Armstrong, an editor, testified that Calvert stated to him in 1873 that Mrs. Denny was about to sue him for wages as house-keeper; that he had paid her in full, but would pay her more, if she would leave Vicksburg; that he regretted deeply the fix he was in with her, because it prevented people from recognizing him socially.

David Kennedy was, at the time of Calvert's death, his foreman, had been so for many years, was at his house constantly during all of this time, sat by his bedside in his last illness, and nursed him until his death, always knew the petitioner as his house-keeper, and himself addressed her, and heard her addressed, as Mrs. Denny. Calvert so addressed her on his death-bed; and, calling her by that name, told her, a day or two before he died, that he had given her enough to make her comfortable, if she would take care of it (alluding to some deeds of gift, to be presently referred to). Heard Mrs. Denny once threaten to sue him for her wages, which she stated were $10 or $12 per month. Thinks this was after her return from Garvin's.

Frederic Speed was Calvert's regularly retained attorney during his life, transacted all of his legal business, and drew his last will and testament a few days before his death, and in contemplation of impending dissolution. By this instrument, which was wholly dictated by Calvert, without suggestion from any one, the whole of his property, after some small bequests to friends, was devised to his brothers and sisters, and neither the name of the petitioner nor that of her child, Mollie, was mentioned in it. While it was being prepared, the petitioner came into the room, and, going up to the bedside, said, in an excited tone, " Mr. Calvert, I want none of your property, but I do not want you to die and say that I ever wronged you." He replied, " Mrs. Denny, I have made provision for you and your child, but I will never say that you

never wronged me." The petitioner expostulated in an earnest manner against the intimation contained in his remark, and insisted that he should withdraw it, saying, that " he must not die with those words upon his lips." He continued to repeat that he would not say that she had never wronged him, until finally she left the room, evincing great excitement and agitation.

This scene is also deposed to by two other witnesses who were present. In explanation of it, two significant facts appear by the record ; namely, that Calvert, while always acknowledging and claiming the child Mollie as his own, had expressed doubts to several persons as to the paternity of the other children born during the connection ; and that, a day or two before this scene, and in contemplation of coming death, he had executed deeds whereby he had conveyed to the mother and child, by separate instruments, two houses and lots, in the city of Vicksburg, together with all of his furniture. In these conveyances the petitioner was designated as " Mrs. Kitty Denny," and the child as " Mary Jane Denny," — designations which seem utterly fatal to the theory that he then recognized the one as his wife and the other as his legitimate daughter. The attempt was made to show that the will as well as these deeds were brought about by the interference and undue influence of parties hostile to the petitioner, by whom the dying man was surrounded ; but we see nothing in the record to warrant the suggestion.

Henry M. Floyd, the executor of Calvert's will, and appellant in this suit, knew the testator very intimately for years, and knew also the petitioner. Always knew her as Mrs. Denny, and as Calvert's house-keeper. He once advised him to marry her privately, and he flew into a rage, and said that his relations would come from Ireland and from the North and kill him if he did so ; never heard her called Mrs. Calvert but once, and that was by a negro, who came to the gate and asked for " Mrs. Calvert," whereat Calvert became very angry, and told his servant to shoot the negro. This was in the fall of 1873.

E. J. McGarr, a lawyer, and a witness for the petitioner, testified that in the fall of 1872, or 1873, the petitioner came to

consult him professionally, and to ask him as to what was her legal *status* or claim on Calvert.  She stated to him fully how her illicit intercourse with Calvert had commenced and continued, told him about the birth of the four children, and the survival of one of them, and, in short, narrated the whole history of their connection.  McGarr declined to express any opinion, without reflection, and by appointment she returned the next day.  He then told her that in his opinion she was legally the wife, and not the concubine, of Calvert.  She was greatly surprised and astonished at this.  Witness went fully with her into the law of marriage, and what was necessary to constitute it, and finally showed her the twenty-second section of the twelfth article of the constitution, and stated to her that in his opinion that instrument had transformed her into Calvert's wife.  At all of this she seemed much surprised.  A few days after this, Calvert called to see him, in an evidently disturbed state of mind, and asked him if he was serious in what he had stated to the woman.  The witness assured him that he was, and went over with him the same line of argument that he had used with the petitioner, and showed him also the constitution.  Calvert was greatly disturbed, depressed, and surprised.  The witness declares that he seldom ever saw a man so overwhelmed with astonishment as Calvert was at the idea that he was already a married man.  He frequently, during the next two months, approached the witness on the subject, and always begged him not to press the matter.  He told the witness several months afterwards that the affair had been arranged, and thereafter never alluded to it again.

A day or two before Calvert's death, the witness received a note from the petitioner, in these words: " Come to-day.  Mr. Calvert is in a very critical condition, and I want our business fixed up."  (There is some doubt whether this note was written by petitioner, or by her daughter, Nellie Denny.)  The witness went out, and found Calvert in a dying condition; had an interview with the petitioner in the kitchen, who told him that Mr. Calvert was surrounded by interested persons, and, she was afraid, would die without making provision for her.  The witness told her that if she was legally his wife, as he (witness) thought she was, that she could not be injured, as the law

would provide for her.   The witness then left, and saw her no more.

It will be observed that the first interview between the petitioner and this witness, as well as those between him and Calvert, in which the petitioner and Calvert both expressed such profound astonishment at being informed that the constitutional provision had made them man and wife, occurred long after the return from Garvin's, when, as is pretended, the acceptance of and acquiescence in the constitutional marriage took place, and several years after Mr. Morris had called Calvert's attention to the particular section which was supposed to have had that effect.

Dr. W. T. Balfour was Calvert's regular physician, and attended him during his last illness; always knew the petitioner as Mrs. Denny; always so addressed her, and heard Calvert so address her in his last illness.   During this illness, the petitioner called at the house of the witness, and begged him to influence Calvert to marry her.   The witness declined to do so, and referred her to Rev. Dr. Price, in whose church Calvert was a pew-holder.

Rev. Robert Price, D.D., was pastor of the First Presbyterian Church, in which Calvert rented a pew, though he was not a communicant.   He testified that, some days before Calvert's death, the petitioner called to see him, and introduced herself by saying: " My name is Mrs. Denny; I am Mr. Calvert's house-keeper.   This little girl (alluding to the child, Mollie, who was with her) is his child.   As Mr. Calvert is a member of your church, I have called to ask you to use your influence to induce Mr. Calvert to make some provision for his child."   Dr. Price informed her that Mr. Calvert was not a member of his church, and that, being almost a stranger to him, he did not feel authorized to advise him on a subject so delicate.

This recapitulation gives a portion only of the facts which go to overthrow the testimony of Nellie Denny.   Substantiated as these facts are by a number of disinterested witnesses, embracing many of the best citizens of Vicksburg, taken from every rank and condition of life, they seem utterly irreconcilable with the idea that Calvert had enacted with petitioner the formal ceremony of acceptance of the con-

stitutional provision narrated by the daughter, and they are even more inconsistent with the theory that thereafter he regarded her as his wife. Indeed, the statement of the daughter bears upon its face more than one strong mark of improbability. It is incredible that a woman should have lived in adultery with a man for years, anxious all the time to become his wife, as the petitioner is shown to have been, and as every woman under the same circumstances would naturally be ; that she should have refused marriage when offered to her, because the ceremony was to be performed by Protestant instead of Catholic rites ; that she should have abandoned her paramour because of this disagreement, should then have returned in a few days and resumed her former mode of life, merely upon being shown a paragraph in the constitution of the state, and thereafter should have lived contentedly for years without any public acknowledgment or social recognition of the changed relation which she bore.

Of the testimony of Morris and Barbour, it is to be remarked, that, while it seems irreconcilable in some respects with much other testimony in the case, and particularly with that of the petitioner's witness, McGarr, it shows, when closely examined, a great anxiety upon the part of Calvert in relation to his daughter Mollie, but none whatever in reference to the petitioner. It is always in reference to the child, and never in relation to the mother, that he speaks in all his interviews with both Morris and Barbour. He showed some anxiety to legitimatize the one, but none whatever to wed the other. We think the truth must be, in view of all the testimony, that Calvert, who is shown to have been deeply imbued with family pride, and much given to boasting of his ancestry (which is said to be not uncommon with Irish gentlemen), and to have been particularly fond of talking of a brother in the British army, shrank with horror from marrying a woman whom he regarded as his hired servant, and with whom he had lived for years in adultery. And yet there was a constant struggle between this feeling and his natural affection for the offspring of this illicit connection.

Upon being shown the paragraph of the constitution by Morris, he must, with the confused notions of an unpro-

fessional and half-educated man, have conceived some sort of idea that it afforded a means of rendering the child legitimate without making the mother his wife.   As irrational as this theory seems, it is the only one that can reconcile his profound astonishment when McGarr informed him that his house-keeper was his wife, and his production to Barbour of the same constitutional provision to demonstrate that he need obtain no act of the legislature to legitimatize his child.

However this may have been, we can only say that a careful and patient perusal of the testimony leads us to the conclusion that the petitioner has failed to show that she is the widow of George Calvert.   The decree of the court below will be reversed, and the petition dismissed.