L. B. ADAMS, ADMR., ETC. *v.* SUSAN ADAMS.

MARRIAGE.  *Cohabitation.  Const. art.* 12, § 22.

    A man and woman whose connection began in the lifetime of a former
    wife, who died in 1867, if they desired marriage, lived together as
    husband and wife, and so held themselves out to the world, at the
    ratification of the Constitution of 1869, were, by art. 12, § 22, thereof,
    united in matrimony, without any new consent or formal ceremony.

APPEAL from the Chancery Court of Tishomingo County.

Hon. L. HAUGHTON, Chancellor.

Bryant Adams was engaged to be married to the appellee;
but the marriage was prevented by his relatives, and, in 1833,
he married Ritta Smith in Pitt County, North Carolina, where
they all then resided.  Ritta became the mother of four children,
of whom the appellant is the eldest.  After her death, Bryant
went again to see the appellee, they were again engaged, and
agreed to run away and marry, but his relatives again in-
terposed, and Bryant married Sallie Smith.  Some time
afterwards, and while he was living with Sallie, he came to
the appellee, and told her that she was the only woman
he ever loved.  She replied that he was the only man that she
had ever loved.  And before any cohabitation they then agreed
to live together as husband and wife till death parted them.
That was the only agreement ever entered into between them
to live together as husband and wife; no such agreement was
ever afterwards mentioned, but from that time they so lived
together without any change whatever.  The marriage with
Sallie Smith was in 1844, and with her Bryant lived about
three years, during which time he became intimate with
Susan, moved her into a house on his farm, and, while
living there, she became the mother of two of his chil-
dren.  On that account, Sallie left Bryant in 1847, taking
the negroes, who had been given her by her father, and
went to her brother, with whom she stayed until 1867, when
she died.  No divorce was ever sought or obtained.  After
Sallie left him, Bryant took Susan and the children of
Ritta, and, leaving North Carolina, set out for Arkansas.  When

they left, they agreed to keep secret the fact that they were not married, and not to write back, in order that their acquaintances there, being ignorant of their whereabouts, should be unable to expose them. They stopped in Alabama and remained there a year, living and holding themselves out to the world as husband and wife. In 1848, they moved to Tishomingo County, Mississippi, where they remained until 1878, when Bryant died. During all this time, they were generally regarded as man and wife, and lived together as such, and the fact that they were not married was not divulged.

On Dec. 1, 1869, the State Constitution was ratified by the people of Mississippi. Sect. 22 of the twelfth article thereof is as follows : " All persons who have not been married, but are now living together, cohabiting as husband and wife, shall be taken and held, for all purposes in law, as married, and their children, whether born before or after the ratification of this Constitution, shall be legitimate, and the legislature may, by law, punish adultery and concubinage."

No agreement was made by Bryant and Susan to accept the constitutional provision as establishing any new relation between them. There was no difference or change in their manner of living during any of the years from 1867 to 1871 inclusive. Susan never knew any man but Bryant. He was the father of her two other children born before his wife died in 1867, and he always recognized Susan's four children as his, and so treated them to the hour of his death. Bryant Adams was the owner of certain property in Tishomingo County. The appellee's petition for dower therein against his heirs and the administrator of his estate was answered by the latter, who denied that she had been the decedent's wife, and appealed from the decree awarding dower, upon the foregoing as the agreed facts of the case.

*Beall & Critz*, for the appellant.

The intercourse of the appellee with Bryant Adams was begun in adultery and disregard of the rights of his lawful wife. The contract, dictated by the spirit of free love, is a stab at one of the holiest relations of life, and, if made a precedent, will shake the foundations of society. 1 Bishop on Marriage and Divorce, § 3. To change adultery into matrimony, more

proof of an acceptance of the altered state is required than a mere continuance of illicit intercourse after all impediments to marriage are removed. *Rundle* v. *Pegram*, 49 Miss. 751. The constitutional provision was for the benefit of emancipated slaves, who could not marry while in bondage; and, for it to operate in any case, the cohabitation must have been in good faith, and violative of no person's rights. These persons were impostors, deceiving their neighbors. If they were living in lawful wedlock, or so intended it, why did they fear exposure? There was no agreement between them to accept the new organic law, or any difference or change in their manner of living, or any declaration or public act from which such agreement might be inferred. *Floyd* v. *Calvert*, 53 Miss. 37. The section was designed to protect those who, in a moral sense, were living together as husband and wife, but was never intended as a general amnesty by which all sins against the institution of marriage should be condoned.

*J. A. Brown*, for the appellee.

As these old people wanted to marry, regarded each other as husband and wife, and were so regarded by every one, their good faith having stood the test of twenty-five years, and lasted till death, when the impediment of the former wife was removed, they were married by the subsequent Constitution. Prior to the ratification of that instrument, the marital and parental relations were fully adopted, and, a respectable and respected family, they had children who called them father and mother, and knew nothing to the contrary. There could be no external relation after the Constitution different from what it was before. But those relations previously existing, by recognition of the parties and others, the Constitution, as said in *Rundle* v. *Pegram*, 49 Miss. 751, " established legal relations." If they truly regarded each other as husband and wife, it was natural and proper for them to live after the ratification of the Constitution just as before. To have had a public ceremony after Mrs. Sallie Adams's death would have injured both them and their children, by exposing the fact of their having no marriage before. An agreement to accept the Constitution, made after its passage, would have been unnatural, and utterly inconsistent with their prior lives. To hold such a

contract essential would be to defeat the Constitution, for no one but Mrs. Kitty Denny ever dreamed of going through the ceremony described in *Floyd* v. *Calvert*, 53 Miss. 37. These persons, however, agreed "to live together as husband and wife till death parted them." Pursuant to that contract, they so lived for nearly thirty years. Their purpose never changed, but grew stronger with age. When the impediment was removed, the Constitution carried out their design.

CHALMERS, J., delivered the opinion of the court.

The agreed state of facts brings the parties, we think, fairly within the provision of Const., art. 12, § 22. They were persons who at the date of the ratification of the Constitution had not been married, but were living together as husband and wife, and such persons were by the provision in question made husband and wife. The clause was undoubtedly intended principally to apply to our colored population, but it embraces all who fall within its provisions. These parties desired to form a matrimonial connection. They were prevented from doing so during the life of the first wife by the law of the land, and, after her death, by a desire to conceal from their acquaintances in their new home the unlawful connection existing between them. While in this condition, living together as husband and wife, holding themselves out as such, desiring between themselves and supposed by all who knew them to be such, the previous disability having been removed by the death of the former wife, the Constitution went into effect and obviated the necessity of any new consent or formal ceremonies. The case is essentially different from *Rundle* v. *Pegram*, 49 Miss. 751, and *Floyd* v. *Calvert*, 53 Miss. 37.

*Decree affirmed.*