## MARY W. ALBEE
### v.
## CHARLES S. ALBEE.

*Divorce—Desertion—Wife from Husband—Non-resident.*

1. It is not to be laid down as settled law that a wife must live with her mother-in-law, or upon refusing to do so, be divorced for desertion.

2. An agreement by a woman before her marriage to live when married in the house of and with her mother-in-law is of no force; all such promises are merged and obliterated by the marriage contract.

3. In the case presented, this court holds, in view of the evidence, that complainant is not a *bona fide* resident of the State of Illinois.

4. The statute requiring residence, should have a strict construction.

[Opinion filed December 7, 1891.]

APPEAL from the Superior Court of Cook County; the Hon. HENRY M. SHEPARD, Judge, presiding.

Mr. H. F. WHITE, for appellant.

Messrs. BISBEE, KERN & REED, for appellee.

MORAN, J. We have examined with care the evidence in this case and have come to the conclusion it does not warrant the decree entered in the court below. The bill is filed for divorce on the ground of desertion. The evidence shows that the parties were married at Bellows Falls, Vermont, in October, 1885. At the time of the marriage, appellant was running a small millinery store at Bellows Falls, and appellee, who was the only child of his parents, was working on the farm of his father and living with his father and mother on said farm a

Albee v. Albee.

few miles from Bellows Falls. After the marriage, the young couple went to live in the house with his parents, though the wife continued her business in Bellows Falls, going back and forth every day. As is not unusual in cases where the son brings his wife to his mother's house to live, the daughter-in-law and mother-in-law did not get along pleasantly and appellant sought to induce her husband to take rooms in the village and live there, and offered to pay for them herself. This he says he was ashamed to do and leave his good home. She testifies that she suggested to him that his father might build· a home for them and pointed out a place on the land where it could be built, and he said that his father was willing to do it, but his mother said no, there should be no other house built, that if the house was not large enough for appellant, she could get out and leave it.

In March, 1886, they talked about going to some other place to live. She wanted to go to Rutland and persuaded him strongly to go. He was reluctant, and testifies that he did not consent to her going, but she swears that he did consent to her going and promised to go with her. It is agreed by both that he took her to the depot one Saturday when she started to Rutland, and that he packed up her goods and furniture and brought them to Rutland, where he went on the following Thursday and joined appellant and lived with her at her father's house. He obtained employment in Rutland and remained there, living with her till June 28th, when he went home to his father. He testifies that he wanted her to go back with him to live there, but her story is that he told her that his people wrote him that they were lonely and sick, that he was out of work in Rutland, that he thought he would go and help his father through haying, and asked her to come over after the fourth of July and spend the vacation when her busy season in her business was over. It is agreed by both of them that she did follow about July 4th, taking with her ·merely some dresses to wear, but no furniture, and that she remained living with him at his father's for some five weeks. She returned in August, and shortly thereafter he called for her at Rutland and they went to Saratoga Springs, and then

returned to his father's, where she remained living with him till about September 2d. She testifies that his mother made it very unpleasant for her during this time. She would say to her that she thought she, appellant, would want to go back and attend to her business, that if she stayed away from her business so long, she would not know what would become of it. Some of the time the mother-in-law would not speak to her; if appellant came out on the porch where she was, she would leave and go inside. When appellant left to return to Rutland on September 2, 1886, appellee drove her to the depot. She testifies that when they were leaving, his father and mother were in the yard, and her husband asked her if she noticed that they did not invite her to come back. He said, "I'll give mother hell for that." She said, "Don't, for my sake," and he said, "They can't treat you like that and have it go with me." In his denial of this on rebuttal he contents himself with denying that he said he would give his mother hell. He says she left this time against his will. She says he consented and was to come to Rutland to her. She testifies that he came to Rutland in September, and said he would try to get work. This he denies, but both agree that he was there in October, on the anniversary of their marriage, and again during the same month when she was sick, and stayed some days living with her, and she says he told her he must go home, as his folks thought he was in Boston, instead of Rutland, and that he promised her to return in two weeks and bring her back to the farm, where she says she consented to go. He says that he went to see her in October but that he had a letter from her in September (the contents of which he gave from memory, the letter being lost), in which she told him if he wanted to see her, he must come to Rutland, as she had left Bellows Falls for the last time.

She wrote him several letters from October to December, 1886, which he says he received, but she says she received no replies to them and he does not pretend that he wrote any. Fearing that he did not receive her letters in December, the week before Christmas she went to Bellows Falls and went to his mother's house and asked for him and the mother said he

was down at Russell's farm, and appellant went down there
and saw him, and he asked her what she was doing there.
She asked him why he had not answered her letters, and he
said he had not time and that he did not intend saying any-
thing, that he had said all he intended to. She testifies that
he then said he would come to the hotel for her that after-
noon and take her up to the house. He did not come and she
remained at the hotel all night. The next day being Sunday,
she sent a message to him at his mother's house, but his mother
said he was not at home. That Sunday evening appellant
walked two miles to the farm where appellee was working,
but his boss said he did not know where he was. On Tuesday
she went to his mother's house to see him and his mother
came to the door and said, " Charley is not at home, and if he
was I would not let him see you. He don't want you. You
have made trouble and we don't want to see you."

Appellant remained at the hotel for several weeks, waiting
to see him, but he was away. In January she learned he was
at Barre, ten or twelve miles away, and she went there and
found him. He wanted to know how she knew he was there.
She swears she asked him why he did not come after her to
Rutland and he said he had changed his mind and he had no
place to take her to, " only up home, and you don't want to go
there." I said, " I have not refused to go there." He said
"They don't want you there now. I don't think mother would
have you there now." She further says that she never re-
fused to live with him at his father's house, but she does not
pretend to deny that she did not want to do so. She swears
that in this interview, in January, 1887, she said to him that
she would sell out her business and give the money to him, so
that he might provide a home for her. He said, " Is that an
insult? You have a good home and can stay there." She said,
"I left that home for you; I did not marry the home, I married
you, and if I can't be with you, I don't want to live." He
said, " Go home and stay, and when I am ready I will send for
you." She said, " I would live in your father's sheephouse, if
you will put the windows in; I will live anywhere to be happy
with you." He asked her if that was another insult. She

asked him to drive her back to Bellows Falls, but he said he had an appointment, but would come to the hotel at 7:30, and take her to his father's house, but he never came. She stayed about a week longer in Bellows Falls, but hearing nothing from him, returned to Rutland. He testifies that he was informed by third parties that she was staying near Bellows Falls in December. That he went to the Barre place on December 30th, but did not go to avoid seeing her. That he saw her when she came over in January and that she wanted him to go to Rutland and came for that purpose. He said he had no business at Rutland, but if she would come back to Bellows Falls and live at his home as per agreement, they would be on the road in five minutes.

It is perfectly apparent from the record that the only subject of difference between these parties at any time, was as to the matter of their living in his father's house with the old people. She loves her husband and has evidenced by her conduct a strong desire to live with him instead of deserting him. He finds no fault with her except that she would not live at his home, that is, with his father and mother. It is undoubtedly true that she did not desire to live there and did all in her power to persuade him to live with her somewhere, in fact, anywhere else. She wrote the letter in September that she had left Bellows Falls for the last time, as a means of inducing him to find her another home, but that she did not mean by what she said to desert her husband is shown by her conduct in December and in January following. The particulars of what preceded and followed the letter and what occurred at the time of her departure before the letter was written are important to be considered, and these proceedings and attendant circumstances negative the inference of an intention to desert. Besides, it is not to be laid down as settled law that a wife must live in the house of her mother-in-law or be divorced from her husband for desertion. Much stress is laid on the fact that before the marriage she agreed to live at his mother's house. Such an ante-nuptial contract is of no force; all such promises are merged and obliterated by the marriage contract which bound the husband to "leave father and

Albee v. Albee.

mother and cleave to his wife." It is proved that the house was large and comfortable, but his wife wanted more than mere space and convenience. She wanted peace of mind and happiness and was willing to live with him in his father's sheephouse in order to be happy. In Powell v. Powell, 29 Vt. 148, where a wife persisted in her refusal to live with her husband near his relations and he persisted that she should do so, that being the only cause of separation, it was held not to constitute willful desertion on the part of the wife. While the court recognizes the right of the husband to determine the abode of the family, and that it is in general the duty of the wife to submit to such determination, yet this, says the court, is not an entirely arbitrary power on the part of the husband. He must use reason and discretion. "Any man who has proper tenderness and affection for his wife would certainly not require her to reside near his relatives if her peace of mind were thereby seriously disturbed." And further the court says, "Every one at all experienced in such matters knows that it is not uncommon for the female relatives of the husband to create, either intentionally or accidentally, disquietude in the mind of the wife and thereby to destroy her comfort and health." This is the wisdom of the Supreme Court of appellant's own State, and if he had heeded its suggestion he need not be a "stranger in a strange land," seeking a divorce from a loving wife whose only fault seems to be that she could not live in peace with his mother. The letter of September in which she says to her husband that she has left Bellows Falls for the last time, was evidently regarded by appellant as a point of great importance in his case. The date of that letter is taken as the commencement of the desertion. His mother saw it and is able to repeat its contents verbatim after the lapse of more than two years. When he came to Chicago to procure his divorce, this letter was shown to his friends here, and one of them testifies to its contents. After the receipt of this letter, he assumes a new attitude toward his wife, his mother is more frank and outspoken in her statements to her, and they all conduct themselves as though they had got a point and were inclined to hold on to it. The approaches of

the wife when she comes to Bellows Falls are coldly received, he has business away from home, and his mother " would not let her see him if he was home." The mother testifies that at this time there was unpleasant talk between them; that appellant said that she, the mother, was the biggest liar in town, and that she told appellant that said appellant had deceived Charles from the beginning of their married life to the present time about owing money, etc. " Then she talked very hard to me and I came into the house." Appellant, having said she would not come back, was to be kept to her word. She would be allowed no *locus penetentia*. Her letter was the basis of a case for desertion. The home in which her husband insisted she should live was made more cold and repellant to her, and her husband, when she sought him, found occupation ten or twelve miles away, and when found by her, his question is, how she found out he was there. Under such circumstances the one who is away from the home may be truly said to be the deserted one and the one who remains the deserter.

But there is another reason why the decree must be reversed. We are compelled to the conclusion that appellee is not a *bona fide* resident of this State; that he came here away from his home in Vermont for the mere purpose of obtaining a divorce. At the end of about two years from the date of the September letter, appellee came to Chicago. He came in September, 1888, and as he says " went down home " early in December, and came back here in August or September, 1889, and immediately filed a bill for divorce. He then remained here till early in the winter of 1889, when he went back to his father's in Vermont and stayed till March, 1890, when he again came to Chicago and remained till July. Then he went home to Vermont, and spent a month and returned here, where he remained till this case was tried in July, 1891. In the meantime his first bill was dismissed and this bill was filed in September, 1890.

The case shows that he is the only son of a farmer who has a farm of 200 acres of land; that his parents desired him to live with them and that he felt he could not live anywhere

Albee v. Albee.

away from them even to make his wife happy. He has no trade, is only a farmer, and part of the time that he has been living in Chicago has worked for his board. He has been sick about two-thirds of the time while he has been in Chicago, and the best wages he has been paid when he worked was $2 per day, and he pays $6 per week for board. The man who employs him and with whom he boards is a relative. He swears now that he does not know what the desires of his parents are with reference to his return to their home. It does not appear that he ever had ill health there, and it is shown that he could earn at least $20 per month and board. No reason is given for this change in his sense of filial duty and the indifference of his parents as to his living with them, nor as to why the sentiments of the family on that question should alter just two years from the date fixed as the commencement of the desertion. It may be that the period has some relation to the fact that in this State, which seems to have been selected by him as the forum of his divorce suit, two years' desertion is a ground for divorce, while in the State where his home is, three years is the period.

The conviction is forced upon us from a consideration of all these circumstances, that he is a mere sojourner here, till his divorce might be obtained. The statute requiring a residence in this State should have a strict construction for the sake of the good name of the State if nothing more, and no encouragement should be held out to such as come here away from their homes and the domicile of the defendants to trouble our courts with their marital infelicities. Hitchins v. Hitchins, 41 Ill. App. 82. The residence of this defendant is not *bona fide* and on the merits he has made out no case.

The decree will be reversed and the bill will be dismissed.

*Decree reversed.*