MARGARET BLANKS *v.* SOUTHERN RAILWAY COMPANY.

1. MARRIAGE. *Common law. Married woman.*
    A married woman cannot contract a common law marriage.

2. SAME. *Agreement. · Cohabitation.*
    Cohabitation, however long continued, between a married woman and an unmarried man will not ripen into a valid common law marriage, although from the beginning they agreed to be husband and wife, and constantly thereafter claimed and held themselves out to the world to be married each to the other.

FROM the circuit court of Clay county.

HON. WILLIAM F. STEVENS, Judge.

Mrs. Blanks, appellant, was plaintiff in the court below; the railway company, appellee, was defendant there. In truth, however, the suit was defended (for reasons apparent from the opinion of the court) by the brothers and sisters of Daniel Blanks. The court below gave a peremptory instruction for defendant, and from a verdict and judgment in pursuance thereof, the plaintiff appealed to the supreme court. The facts are stated in the opinion of the court.

*F. G. Barry,* for appellant.

If the *Beardsley Case,* 79 Miss., 417, and the cases of our state which it follows, are to continue to be the law, then, in my opinion, this case is bound to be reversed.

First. If the learned judge in the court below was satisfied that the marriage of Maggie and Dan Blanks was a valid common law marriage, then he should have given the peremptory instruction asked by Maggie Blanks, in accordance with the positive and distinct law as laid down in the *Beardsley Case.*

Second. If the learned judge below did not believe this was a common law marriage, then he usurped the function of the jury and decided a fact which should have been left to the jury. The testimony is overwhelming that this was a valid common law marriage, instituted somewhere about 1884, 1885, or 1886. It unmistakably antedates our Code of 1892, abrogating common law marriages.

The next proposition I beg to submit is, and which is undisputed, that every presumption of innocence is to be indulged in favor of marriages; and I find no law attaching any additional solemnity to a statutory over a common law marriage. A common law marriage, where permitted, is as sacred in the eye of the law as one solemnized by an archbishop, to the strains of Mendelshon's marriage march, or even by a justice of the peace, or a grave and dignified member of the board of supervisors. This presumption of innocence is not confined to any special period when the marriage is solemnized, or entered into.

Third. But I submit if a marriage is entered into before the expiration of the seven years' statute, which raises a presumption of death after the absence of party unheard of and in unknown parts, then this presumption of innocence ripens unto one of perfect immunity to the deserted spouse who has married; that the presumption of innocence at the end of the seven years becomes conclusive and was a shield and protection to Maggie Blanks as much as if Lawson Parker had been, in

fact, dead.   The proof is positive and clear that for the entire period of seven years after her marriage with Dan Blanks and the departure of Lawson Parker, her supposed husband, no one knew or heard of the said Lawson Parker.

*McWillie & Thompson,* on same side.

The court below at the conclusion of the evidence resolved the question, as a matter of law, and gave a peremptory instruction for defendant, and the plaintiff hath appealed to this court.

Of course, the main question before this court, and the only one on this branch of the case is, whether or not a verdict in plaintiff's favor, if rendered, should have been permitted to stand as one supported by evidence, and on this point the inquiry is, did any of the evidence tend to support plaintiff's case so as to make it a proper one to have gone to the jury ?.

To understand the plaintiff's case it is necessary, first, to determine the date of her marriage—a good common law marriage —to the deceased Daniel Blanks.   The date is not shown absolutely, but the evidence clearly and unmistakably fixed the date as anterior to the adoption of the Code of 1892.   Therefore, Code 1892, § 2864, has no application to the case.

The evidence is certainly ample to establish not only *prima facie* but almost conclusively a valid common law marriage. 19 Am. & Eng. Enc. Law (2d ed.), p. 1181, and authorities cited.

Such marriages were recognized as valid in Mississippi before the adoption of the Code of 1892.   *Dickerson* v. *Brown,* 49 Miss., 357; *Floyd* v. *Calvert,* 53 Miss., 37; *Rundle* v. *Pegram,* 49 Miss., 751; *Hargroves* v. *Thompson,* 31 Miss., 211.

It was not shown absolutely and conclusively that plaintiff's pretended first marriage, the one to Lawson Parker, was valid.

If the marriage to Parker was valid, yet every presumption favors the validity of the second one — the marriage to Dan Blanks; even a divorce from the first husband will be presumed,

and the burden of proof was on defendant to rebut these presumptions. No evidence whatever was introduced to rebut presumptions, nothing to show that a divorce was not obtained; on the contrary, the testimony at least slightly tends to show a divorce.

The case of *Alabama & Vicksburg Ry. Co.* v. *Beardsley*, 79 Miss., 417, settles this question.

*S. G. Ivey* and *T. C. Kimbrough*, for appellee.

In *Alabama & Vicksburg Ry. Co.* v. *Beardsley*, 79 Miss., 417, this court says "that a divorce from a former wife who is still living will, in the absence of other evidence, be presumed upon due proof of the husband's second mariage. A marriage duly proven will be presumed valid, etc." .

There was no question about the second marriage in that case. It appeared uncontradicted that it had been solemnized according to the form of law, every presumption must be indulged in favor of its validity. *Hull* v. *Rawls*, 27 Miss., 471; *Powell* v. *Powell*, 27 Miss., 783; *Ward et al.* v. *Dulaney*, 23 Miss., 410; *Wilkie.* v. *Collins*, 48 Miss., 496.

*Mayes & Longstreet*, on same side.

This case is not controlled by the *Beardsley Case*, 79 Miss., 417. It is in a very different attitude. There the court had before it only three facts: (1) the former marriage, (2) the later marriage, (3) the life of the former wife. The question of the validity of the second marriage had not been put formally in issue by the pleadings, but cropped out as a surprise to the plaintiff on the trial; and when it did crop out there was absolutely nothing to challenge the validity of the second marriage except the isolated fact that the husband's first wife was still living; and this court properly held that in such case, no question being made about the due and actual solemnization of the second marriage, a divorce would be presumed. If the man

had not been divorced, he was unquestionably guilty of bigamy.

In the case at bar, the very question in issue, formally so put, is whether there ever was a second marriage.   In the *Beardsley Case,* there were no facts whatever before the court except the ones stated above; while here all the facts are before the court and the plaintiff's own testimony shows that her relation with the deceased was one of concubinage in its inception, and never was anything else.

CALHOON, J., delivered the opinion of the court.

Daniel Blanks was run over and killed by an engine of the Southern Railway Company while he was in the service of that company, and Margaret Blanks sued the company, claiming to be his widow.   A separate action for damages was brought by his heirs.   The company admitted liability, and the parties to both actions agreed that, if Margaret recovered in her action, the recovery should be $1,250.   The court below peremptorily instructed the jury to find a verdict for defendant company, and the only question is whether she was the wife of the deceased, and this must be determined on her own testimony.   Her only pretense of wifehood in her relations with Daniel is based on her claim that there was a valid common law marriage between them before the Code of 1892, requiring formal celebration, took effect.   Her story is that she, at the time when she had never been married, though she was the mother of a bastard child, some twenty years ago, was married to a man who, inasmuch as he was not the father of the bastard, we may assume, on matrimonial concerns, was free from petty scruples.   His name was Lawson Parker.   As to this marriage we quote from plaintiff's testimony as shown in the record: "Q. Were you ever married legally?   A. I don't know, sir.   Q. Didn't you say you were maried to Lawson Parker?   A. I had a man by that name.   Q. Were you legally married to him?   A. I don't know.   He and a preacher were there, by the name of Hamp

Crawford. Q. Did he perform a ceremony? A. I don't know, sir. He said something. Q. Did he pronounce you man and wife? A. I don't know, sir; but we went together under that head." She says this marriage with Lawson was at her father's house. Pursuant to that maneuver, Maggie and Lawson lived together "under that head"— that is, under the head of husband and wife — for, as she says, two or three years, when Lawson, weary of well-doing, threw off the connubial yoke and of his own motion, without disturbing the courts, left for parts unknown. Something more than a year after his departure, a singular courtship occurred. She says that she was sitting in her door, when Daniel Blanks, the deceased, who was a perfect stranger, whom she had never seen before, came up, and she says: "He preferred he was lonely. I was sitting in the door there by myself, and he asked me if I was lonely, and I preferred yes, I was lonely, and he asked then if I would like to be his wife, if I would be the mother of his child, and I said I thought I could, and he asked me if I could live in his house and treat him adjustably, and I told him I thought I could. Q. Did you tell him in what way you wanted to live? A. As his wife. That is the way I went to him. I did not reconsider myself to have any husband after Lawson left me, and I was living there from hand to mouth, and I wanted a husband, and he said he would be a husband to me, and I said as I was a woman I would accomplish to be his wife, and I went with him." On this primitive, prepluvial agreement they lived together for many years, and up to the time of Daniel's death. But after about a year of their cohabitation there was an unfortunate episode. Lawson Parker turned up! He appeared at Maggie's new home in quite a violent humor, and proceeded to abuse and beat her, without any interference from Daniel, so that she had him arrested and put under bond to keep the peace, and then he left again, and has been seen no more, and Daniel and Margaret continued to live together for ten years or more, until Daniel

was killed by the railroad train. We cannot hold that she was Daniel's wife. In this case the precise issue joined and the only issue tried is whether she was his wife. Since she claimed as such, and since this is specifically denied, the burden is on her to show the legal marital relation. This burden she has not discharged. By her own showing, Lawson Parker was alive when she commenced her cohabitation with Daniel Blanks. This, therefore, was unlawful when it commenced, and continued to be so. No adjudication conflicts with our conclusion on the facts of the case before us, even if we held — which we do not — that the arrangement with Blanks, as detailed, would have been, but for Margaret's previous marriage, a valid common law marriage.

*Affirmed.*