SIMS *v.* SIMS.

[85 South. 73, In Banc. No. 21145.]

1. MARRIAGE. *In suit to annul defendant wife not entitled to temporary alimony unless marriage prima facie valid.*

In a suit by the husband to annul an alleged void marriage, the wife is not entitled to temporary alimony unless it appears at least *prima facie* that the marriage is valid.

2. MARRIAGE. *Validity of "common-law marriage" is recognized by statute.*

Under section 3249, Code 1906 (Hemingway's Code, section 2556), which provides that a license 'shall be essential to the validity of a marriage, but that the section shall not be construed so as to invalidate any marriage that is good at common law, a marriage results from an agreement between a man and woman, qualified for entry into such relation, to become husband and wife, followed by cohabitation, although no license was obtained therefor.

3. MARRIAGE. *Void marriage contracted in good faith becomes valid 'on removal of impediment; new agreement not necessary.*

Where a marriage between a man and woman contracted in good faith is void because of an impediment thereto, they become husband and wife if after the removal of the impediment they continue to occupy that relation in fact, although a new marriage agreement was not made by them after the removal of the impediment. And such persons must be deemed husband and wife in this state although the void marriage occurred in another state, provided that after the removal of the impediment they take up their permanent residence in this state and continue to live together openly as husband and wife; such conduct towards each other, taken in connection with their former association, being equivalent in law to a declaration by each of them that they did and were thereafter to occupy the relation of husband and wife.

APPEAL from chancery court of Lauderdale county. HON. G. C. TANN, Chancellor.

Suit by O. B. Sims against Mrs. Henrietta M. Sims to annul a marriage, or in the alternative, for a divorce. From an interlocutory decree awarding defendant alimony *pendente lite,* plaintiff appeals. Affirmed and remanded.

*W. C. Sams,* for appellant.

The marriage between appellant and appellee was void absolutely and not merely voidable. The relation existing between the appellant and the appellee after their attempted marriage in 1893 up until time of

separation in 1918 was not a marital relation but was a meretricious relation, the marriage having been void from its beginning.

If there was no marital relation, then there never could have been any marital obligation from the appellant to the appellee. *Reed* v. *Reed,* 85 Miss. 127 and 128; *McFarland* v. *McFarland,* 64 Miss. 449.

No marital relation exists or ever has existed between the appellant and the appellee; and no marital obligation has ever been due from appellant to appellee. It should not be necessary to cite the authorities from other states in order to secure a reversal in this case. As stated above, it seems to me that the case of *Reed* v. *Reed,* in 85 Miss., page 126, is conclusive of the whole matter, but there are abundant authorities from other states holding the same rule and I shall call attention to some of them as follows: *Ex Parte Jones* (Alabama case), 53 So. 261, et. seq.; *Arendall* v. *Arendall* (Florida case), 54 So. 957; *Cartwright* ·v. *McGown,* 3 Am. Ruling Cases Annotated, 287-294.

The only foundation for an order for alimony, suit money, and counsel fees *pendente lite* is the fact of marriage between the parties. Citing, *Banks* v. *Banks,* 42 Florida, 362, 29 So. 318; *Rundle* v. *Pegram,* 49 Miss. 751.

"Nor can sexual intercourse, which the parties know to be contrary to law, form even an element of marriage." Citing *Peck* v. *Peck,* 12 R. I. 485. Most probably, the appellee will contend that the pretended marriage between appellant and appellee was ratified by appellant because of the fact that appellant and appellee lived together for many years, from 1893 to 1918; but such view is untenable and unsound and contrary to the law as it exists in Mississippi. This contention is completely answered by the case of *Blanks* v. *Southern Railway Co.,* 82 Miss. 703-709.

A married woman cannot contract a common-law marriage; also, cohabitation however long continued between a married woman and an unmarried man will not ripen into a valid common-law marriage. *Blanks* v. *Southern Railway Co.,* 82 Miss. 703, et seq.

It is seen that the relation between appellant and appellee was unlawful when it commenced, and continued to be so. If the relation was unlawful or meretrious it was not marital, then there could not and cannot be any marital obligation on the part of the appellant to pay alimony or attorney's fees. See *Reed* v. *Reed,* 85 Miss. 126; *McFarland* v. *McFarland,* 64 Miss. 449; *Cartwright* v. *McGown,* 3 American Ruling Cases, Annotated, page 288 et seq.; *Ex Parte Jones,* 53 So. 261; *Arendall* v. *Arendall,* 54 So. 958; *First Col. Banks* v. *Banks,* 29 So. 318.

The Mississippi authorities and authorities from other states above cited, conclusively show that the learned chancellor below committed grave error by granting to appellee temporary alimony and solicitor's fee, but in order to show the unbroken line of authority in Mississippi in support of the contention of the appellant that no alimony and solicitor's fee should have been allowed by trial court, I wish to cite three other cases decided by the supreme court of Mississippi as follows: *Robinson* v. *Robinson,* 112 Miss. 224; *Aldridge* v. *Aldridge,* 116 Miss. 396 and 397; *Clark* v. *Clark,* 115 Miss. 726 and 729; *Railway Co.* v. *Beardsley,* 79 Miss. 417, 3 So. 660; *Knights of Pythias* v. *Tucker,* 92 Miss. 505, 46 So. 51; *Bennett* v. *State,* 100 Miss. 684, 56 So. 777.

I commend to the court and invite their careful reading of the last three cases cited, as well as *Reed* v. *Reed;* and when the law as expressed in these opinions shall be applied to the facts as shown by record, in my humble* opinion, the decree of the lower court will be reversed and proceedings as to alimony and attorney's fee dismissed. This I earnestly and respectfully ask.

*T. V. Brahan* and *Wallace Walker,* for appellee.

We announce as propositions of law and equity, if Sims did know in 1902, that Mrs. Sims was advised, and did obtain a divorce from Perrin at that time, or could, by proper diligence have known it, he condoned her previous conduct up to that time (See 32 Mississippi, page 329), and his continuing to live with her from 1902, to the date of filing this bill, equitably estops him from getting a divorce. (See section 3249, Code of 1906.)

In the foregoing respects, the instant case is differentiated from *Reed* v. *Reed* in the 85th Mississippi, page 126, et seq., and the *Aldridge* v. *Aldridge case* in 116 Mississippi, page 396, et seq., and while we approve these cases, we earnestly contend that they have no application to the facts of the instant case, neither do the cases cited by counsel in his brief from Alabama, Florida, and other states.

We are glad counsel has cited the Aldridge case by SMITH, C. J., in 116 Mississippi, pages 396 and 397, and which we agree with, as approving the Reed case, for the reason that Judge SMITH says: "We are not here called upon to determine whether or not this rule (Reed case) would apply in view of the provisions of section 1673, Code of 1906, in event appellee had married appellant without knowledge of the facts that renders marriage void," which we contend and which the chancellor believed, the appellee in the instant case was without knowledge at the time of her marriage with appellant of the facts that would render the marriage void, because she thought she was divorced and she told the appellant and gave him sufficient information to have put him upon inquiry at least, and by his conduct he has condoned the marriage, and after living with her for sixteen years is estopped from casting her off. Sims swears that he never knew she was not divorced

until 1919, but when asked why he did not investigate after she had told him in 1893 and 1902, about her divorce, says he did not believe what she told him, etc.; see his testimony at page 19.

We have investigated the law of the instant case very exhaustively and have found a case identical with it in 46 American State Reports, beginning at page 791, et seq., styled *Bardin* v. *Bardin,* which in our opinion as well as the opinion of the learned Chancellor controls this case. *Brinkley* v. *Brinkley,* 50 N. Y. 194, 10 Am. Rep. —.

Marriage and Divorce—Alimony—For the purpose of an application for temporary alimony, etc., the fact of marriage need not be so conclusively established as is required for obtaining permanent alimony. If the plaintiff makes a reasonably plain case of the existence of a marriage, although it is denied by the defendant, she should be furnished with the means of temporary support and of conducting the suit until the truth or falsity of her allegations can be ascertained by the proof formally taken in the case. *Brinkley* v. *Brinkley,* 50 N. Y. 184, 10 Am. Rep. 460. She is also entitled to temporary alimony where the husband files a bill against her admitting a marriage, but alleging it to have been illegal and void, and she denies the facts upon which the supposed illegality is founded. *North* v. *North,* 1 Barb-Ch. 241, 43 Am. Dec. 778. When the facts undisputed are such as that from them a presumption arises that the parties were married so that the affirmative rests upon the defendant to repel that presumption, the court has jurisdiction and power to grant temporary alimony and expenses, although marriage in fact is denied, and the opposing papers show facts irreconcilable with the existence thereof, or of matrimonial cohabitation. *Brinkley* v *Brinkley,* 50 N. Y. 184, 10 Am. Rep. 460. While a valid marriage is necessary to the grant of permanent alimony, temporary alimony will be awarded as a

matter of course upon making out a *prima-facie* case. Upon this question the court will not go into the merits of the case, and try the cause upon conflicting affidavits. See Monographic note to *Methvin* v. *Methvin,* 60 Am. Dec. 669, 674, on Alimony.

A presumption of the death of a prior husband will be indulged to sustain a second marriage; and where a person, whose husband or wife has been absent for five years, without being known to such person to be living during that time, marries, such marriage is valid, though the other husband or wife be living. Note to *Sneathen* v. *Sneathen,* 24 Rep. 331. The judgment of the court with respect to the allowance or the amount of alimony *pendente lite* is discretionary, and will not be disturbed on appeal unless there has been a clear and flagrant abuse of discretion. See Monographic Note to *Methvin* v. *Methvin,* 60 Am. Dec. 679.''

So we most earnestly submit to this honorable court, that the learned chancellor's decree was eminently proper, and should be affirmed on the allowances, as well as his refusal to grant the appeal with *supersedeas,* which we do not believe this court would have granted, except on the *ex parte* showing, and had it been fully advised as to this record; and, we further ask this court to make Mrs. Sims a further reasonable allowance in addition to that allowed by the chancellor for her attorney's services in this appeal. See *Hall* v. *Hall,* 77 Miss. 741, and on a final hearing on affirming and remand of the case, we believe the 'Chancellor should dismiss the bill and allow Mrs. Sims permanent alimony, etc.

Smith, C. J., delivered the opinion of the court.

This is a suit begun by the appellant, the husband, for the purpose of having his marriage with the appellee declared void, or, if that cannot be done, for a divorce,

and the appeal is from an interlocutory decree awarding the appellee, the wife, alimony *pendente lite.*

The bill of complaint alleges that the marriage of the appellant to the appellee is void for the reason that at the time it was solemnized the appellee had a living husband. The appellee's motion for alimony *pendente lite* was heard by the court below on the testimony of herself alone in support thereof and on the testimony of the appellant alone in opposition thereto. From their testimony it appears that they agree upon the following facts: They were married at Crownpoint, Ind., in October, 1893, and that the appellee had been formerly married to one Perrin, who was then living; that in 1902 the appellee sued for and obtained a divorce from Perrin in the city of Chicago on the ground of desertion; that the appellant and the appellee lived together as, and were considered by themselves and the public to be, husband and wife for about twenty-five years, twelve of which, immediately preceding the year 1918, were spent by them in the state of Mississippi; that in October, 1918, this suit was begun by the appellant. It does not appear where the appellant and the appellee lived after their marriage at Crownpoint, Ind., until they came to Mississippi. The validity of the divorce granted the appellee in Chicago is not questioned by the appellant, but, on the contrary, he alleges it in his bill of complaint and filed a copy of it as an exhibit thereto.

The appellee testified that after Perrin deserted her he wrote to her, stating that he had obtained a divorce, and that she could marry again if she so desired; that she believed this to be true and informed the appellant prior to their marriage that she had been divorced from her former husband; that in 1902 Perrin came to see her and suggested that they obtain a divorce, the expense of which would be defrayed by him; that she informed the appellant thereof, and that he raised no

objection thereto, only inquiring who was going to pay the expense of the proceeding; that after the divorce was granted she asked the appellant "if he didn't think that we had better remarry, but he said that everything would be O. K."; that some time in 1918 the appellant forced her to leave him and then brought this suit.

The appellant testified that the appellee told him at the time of their marriage that her former husband was dead, but that some months thereafter, he having become suspicious of the truth of that statement, she told him that she had been divorced from Perrin; that he did not discover that this was not true and that the appellee obtained a divorce from Perrin in 1902 until some time during the year 1918. On cross-examination he admitted that she might have told him in 1902 of her intention to obtain a divorce from Perrin; that he did not recall her having told him, but would not swear that she had not. In answer to the question, "You won't say that you did not have that information?" he replied, "I might have; you understand one is information and one is knowledge."

Marriage being the foundation of the husband's obligation to support his wife (*McFarland* v. *McFarland*, 64 Miss. 449, 1 So. 508), the correctness *vel non* of the decree of the court below awarding the appellee alimony *pendente lite* depends upon whether or not it appears from the testimony, at least *prima facie*, that the appellee is the lawful wife of the appellant (*Reed* v. *Reed*, 85 Miss. 126, 37 So. 642).

The marriage of the appellee to the appellant in 1893 at Crownpoint, Ind., being void for the reason that she was then the wife of another, the question for decision is whether or not their relations after the appellee obtained the divorce from Perrin in 1903 has resulted in a common-law marriage.

48—122 Miss.

Judges STEVENS, COOK, and SMITH are of the opinion
that the decree of the court below should be affirmed, but
Judges ETHRIDGE, SYKES, and HOLDEN are of the opinion
that it should be reversed. Consequently, because of the
equal division of the Judges on the question of the cor-
rectness *vel non* of the decree of the court below and
in obedience to the maxim. "*Semper præsumitur pro
negante,*" the decree of the court below must be affirmed.

Proceeding now to set forth the reasons for the opin-
ion of Judges STEVENS, COOK, and SMITH, two questions
arise. First, is a common-law marriage valid in Missis-
sippi? and, second, does the evidence disclose a com-
mon-law marriage between the parties hereto?

Prior to the Code of 1892 a common-law marriage
was undoubtedly valid in this state, and such a mar-
riage is expressly recognized by section 3249, Code of
1906 (section 2556, Hemingway's Code). As this stat-
ute appears in the Code of 1892, as section 2864 thereof,
it is as follows:

"A marriage shall not be contracted or solemnized
unless a license therefor shall first have been duly is-
sued, and such license shall be essential to the validity
of a marriage."

But when brought forward in the Code of 1906 as
section 3249 (Hemingway's Code, section 2556), the
following language was added thereto:

"But no irregularity in the issuance of or omission
in the license shall invalidate any marriage, nor shall
this section be construed so as to invalidate any mar-
riage that is good at common law."

The two provisions of this statute seem to be in con-
flict, but, if the two methods therein dealt with by which
the bonds of matrimony may be entered into are kept
in mind the seeming conflict will disappear. The first
of these methods is a ceremonial marriage solemnized
pursuant to a license obtained therefor, which marriage
will be valid and binding, although not followed by co-

habitation. The second is that prescribed by the common law, which is an agreement between a man and woman to then and there become husband and wife followed by cohabitation. *Taylor* v. *State,* 52 Miss. 84; *Floyd* v. *Denny Calvert,* 53 Miss. 37; *Maryland* v. *Baldwin,* 112 U. S. 490, 5 Sup. Ct. 278, 28 L. Ed. 822; *Herd* v. *Herd,* 194 Ala. 613, 69 So. 885, L. R. A. 1916B, 1243; *Grigsby* v. *Reib,* 105 Tex. 597, 153 S. W. 1124, L. R. A. 1915E, 1 Ann. Cas. 1915C, 1011.

In most of the states where a common-law marriage is recognized such a marriage may be formed merely by the the use of words of present assent, *per verba præsenti,* though not followed by cohabitation, but the common-law marriage referred to in the statute here in question must, of course, be held to be such as this court had recognized prior to the statute's enactment; in other words, the statute deals with the common law of the state of Mississippi.

This court has not heretofore expressly decided that a common-law marriage is authorized by the statute hereinbefore set forth, but that such a marriage is so authorized seems to have been assumed in *Thompson* v. *Clay,* 120 Miss. 190, 82 So. 1, and to hold otherwise would be in effect to rewrite the statute under the guise of judicial construction and to eliminate therefrom the provision recognizing common-law marriages, which provision the legislature manifestly intended to be effective.

It is not clear, or at least we will assume that it is not, from the appellee's testimony, that she and the appellant entered into a new marriage agreement after she obtained the divorce from Perrin, but no such new agreement was necessary, for the reason that her marriage with the appellant in Indiana was entered into by both of them, according to her testimony, which the court evidently accepted as true, in good faith, under the belief that her marriage with Perrin had been dissolved, and after its dissolution in 1902 they, the appellant and

the appellee, continued in good faith to live together as, and considered themselves to be, husband and wife.

"Their conduct towards each other in the eye of the public (after the removal of the impediment to their marriage taken in connection with their previous association, was equivalent in law to a declaration by each that they did, and during their joint lives were to, occupy the relation of husband and wife." *Traverse* v. *Reinhardt,* 205 U. S. 423, 27 Sup. Ct. 563, 51 L. Ed. 865.

There has been considerable discussion as to whether a new marriage agreement must be entered into upon the removal of an impediment to a valid marriage of persons cohabiting as husband and wife. The cases dealing therewith seem to be divided into three classes, as will appear from a collation thereof in note to *Turner* v. *Williams,* 3 A. R. C. 165, and 18 R. C. L. 436. The first class, which seems to be in the majority, holding that no such new agreement is necessary in any case; the second, that no such new agreement is necessary where the marriage void because of an impediment thereto was contracted in good faith; and the third, and this class seems to be in the minority, that such new agreement is necessary in all cases.

The majority rule is thus aptly and concisely set forth in 1 Bishop on Marriage, Divorce, and Separation, 422:

"If the parties desire marriage, and do what they can to render their union matrimonial, yet one of them is under a disability, as where there is a prior marriage undissolved, their cohabitation, thus matrimonially meant, will in matter of law make them husband and wife from the moment when the disability is removed; and it is immaterial whether they knew of its existence, or its removal, or not."

The principle underlying the decision of *Howard* v. *Kelly,* 111 Miss. 285, 71 So. 391, Ann. Cas. 1918E, 1230, would seem to require this court to align itself with those courts deciding the first of these classes of cases, but

the case of *Thompson* v. *Clay*, 120 Miss. 190, 82 So. 1, clearly belongs to the second of these classes; for, while it was therein held that such a new agreement was necessary, it was also specifically pointed out that both of the parties to the void marriage knew of the impediment thereto, from which it necessarily follows that it was not entered into by them in good faith.

That it does not appear from the evidence where the parties hereto lived after the rendition of the decree divorcing the appellee from Perrin until they came to Mississippi, which seems to have been in the year 1906, is of no consequence, for the reason that, whether or not their relations resulted in a valid marriage in any state in which they may have lived after the rendition of the Perrin divorce decree and before they came to Mississippi their conduct towards each other here, "taken in connection with their previous association, was equivalent in law to a declaration by each that they did, and during their joint lives were to, occupy the relation of husband and wife." *Travers* v. *Reinhardt*, 205 U. S. 423, 27 Sup. Ct. 563, 51 L. Ed. 865.

*Affirmed and remanded.*

Etheridge, J. (dissenting).

I am unable to agree that the Chancellor's order was right in ordering temporary alimony upon the record before us. I have several reasons, but will first address my views to the two propositions discussed in the opinion of the Chief Justice: First, is a common-law marriage valid in Mississippi? and, second, does the evidence disclose a common-law marriage between the parties?

In order to discuss this question properly, it will be necessary to refer to the statutes upon that subject. Section 3245, Code of 1906 (section 2552, Hemingway's Code), provides that marriage licenses shall be granted and issued by the clerk of the circuit court of the county

in which the female usually resides under certain regulations and restrictions therein named, not necessary to set out here. Section 3246, Code of 1906 (section 2553, Hemingway's Code), provides for the return of the certificate of marriage to the circuit clerk and for penalties for the failure to return such certificate. Section 3247, Code of 1906 (section 2554, Hemingway's Code), provides who may solemnize marriages, and section 3248, Code of 1906 (section 2555, Hemingway's Code), provides for a solemnization of marriages according to religious customs and requires records to be kept thereof and certificates to be returned to the circuit clerk of the county. And section 3250, Code of 1906 (section 2557, Hemingway's Code), makes the clerk of the circuit court of each county the legal custodian of papers relating to marriage licenses and certificates of marriage in the county. Section 3249, Code of 1906 (section 2556, Hemingway's Code), provides:

"License Essential.—A marriage shall not be contracted or solemnized unless a license therefor shall first have been duly issued, and such license shall be essential to the validity of a marriage. But no irregularity in in the issuance of or omission in the license shall invalidate any marriage, nor shall this section be construed so as to invalidate any marriage that is good at common law."

Other sections require the circuit clerk to procure marriage records and keep separate records of white and colored races. Construing these statutes together, it is manifest that the legislature intended to keep a public record of each marriage entered into in any county, and the importance of such records cannot well be overestimated. Prior to 1892 there was no such section as 3249. Code of 1906 (section 2556, Hemingway's Code). In 1892 for the first time the Legislature enacted a statute making a license essential to the validity of a marriage, this section reading

"License Essential.—A marriage shall not be contracted or solemnized unless a license therefor shall first have been duly issued, and such license shall be essential to the validity of a marriage."

The words in this section "unless the license shall first have been duly issued" caused some persons to be apprehensive as to the construction that might be placed upon these words. Other sections prescribed how the license should be issued, and it was feared that it might be held on construction that the language "duly issued" would make a literal compliance with the statute mandatory. So the latter part of the section as now written was added, expressly providing that: "No irregularity in the issuance of or omission in the license shall invalidate any marriage, nor shall this section be construed so as to invalidate any marriage that is good at common law."

It is a familiar rule of construction that a statute will be so construed as to give effect to every part of it. If the opinion of the chief justice and those concurring therein is correct, no effect whatever can be given to the first part of the section, and especially that clause which says, "and such license shall be essential to the validity of the marriage." This clause is absolutely written out of the book of three judges of this court. A statute should not receive such construction as would render any of its provisions vain and useless. *Martin* v. *O'Brien,* 34 Miss. 21; *Fitzgerald* v. *Reed,* 67 Miss. 473, 7 So. 341; *Koch* v. *Bridges,* 45 Miss. 247; *Swann* v. *Buck,* 40 Miss. 268; *Adams* v. *Y. & M. V. R. R. Co.,* 75 Miss. 275, 22 So. 824.

Taking the entire statute together and giving effect to each of its provisions, it is impossible for me to reach a conclusion in harmony with the opinion of the chief justice. Manifestly the purpose of the amendment in 1906 was to prevent mere irregularities in the ceremonial part of a marriage from avoiding the mar-

riage, but to require in all cases the issuance of a marriage license. The keeping of records of marriages and of divorces is of the highest importance to society. No construction should be placed upon the statute that sweeps away these safeguards and protection to society. It is undoubted that the state had the right to make such regulations as it may see proper to make regulating the subject. 26 Cyc. 828.

The clause of the statute under review, "nor shall this section be construed so as to invalidate any marriage that is good at common law," clearly refers to the ceremonial part of a marriage and to marriages already solemnized. This construction would make the statute harmonious, to preserve all of the essential features of the entire section and harmonize with the general legislative policy indicated by a consideration of the whole chapter on marriage. What reasoning mind can attribute to the legislature the purpose to require a marriage under a license to go through a process of ceremony, a solemn return, and a recordation of the whole subject if the mere unexpressed agreement or mere living together as man and wife will suffice to satisfy the law. No possible public good can result from such a construction, but, in my view, the gravest mischief will follow the construction attempted to be placed upon the statute. Under the common law of marriage no record need be made, and notwithstanding the possible secrecy of a marriage would make void any subsequent marriage. The evil of the common-law system was that it placed in the power of unscrupulous persons to appear upon the scene and prove a secret common-law marriage after a person's death when in the very nature of things it was impossible for the rightful heirs and wife to disprove such contentions. In many cases property was taken from the rightful heirs and rightful wife, and all of the penalties of dishonor and bastardy were inflicted upon the helpless children.

It is inconceivable to my mind that society should thus be placed at the mercy of shysters and unscrupulous adventurers enabling them to take the accumulatious of years of toil and self-denial intended as a heritage for the rightful heirs.

I see no reason for permitting a marriage to be solemnized or entered into clandestinely and secretly. I cannot understand why any person desiring to enter into the marriage state should object, or not be required, to make some record thereof. No person, however righteous, can be sure that after his or her death the earnings of his lifetime will go to those for whom it was intended, nor can he be sure that it may not be swept away from them by unscrupulous persons and perjured testimony which it would be utterly impossible to successfully refute or contest.

On the second proposition, as to whether there was an agreement sufficient to constitute a common-law marriage, I am unable to agree that there was. The appellee's testimony on this point is wholly insufficient to show a common-law marriage according to the laws of this state after the removal (if there was a removal) of the impediment of the former marriage.

The testimony by Mrs. Sims in substance stated:

"That her first husband came to see her in 1902, some nine years after her alleged marriage with Sims, and asked her to go down with him to get a divorce to make everything safe.

"Q. Did you tell Mr. Sims about that? A. Yes, sir.

"Q. That was in 1902? A. Yes, sir.

"Q. What did he say? A. He didn't say anything about it. He asked who was going to pay the expenses, and I told him that my first husband was. I went down, and when it was all over I met Mr. Sims, and we went to lunch together, and he didn't say anything about it. because I thought he was a gentleman.

"Q. Did he know at the time in 1902 that the divorce was granted that you were going to get a divorce? A. Yes, sir.

"Q. Did Mr. Sims continue to live with you as your husband after this divorce was granted in 1902? A. Yes, sir.

In *Thompson* v. *Clay,* 120 Miss. 190, 82 So. 1, in the second headnote it is said: "Where both parties knew at the time of an attempted marriage that the man had a living undivorced wife, their relation was illegal in its inception, and it must be presumed, in the absence of proof to the contrary, that such illegal relation continued after the death of the legal wife as before, since the change from an illegal to a legal relation in such cases requires more than a mere continuance of living together after the removal of the obstacles to marriage."

In *Blanks* v. *Southern Ry. Co.,* 82 Miss. 703, 35 So. 570, it was held that a married woman cannot contract a common-law marriage, and that cohabitation, however long continued, between a married woman and an unmarried man, will not ripen into a common-law marriage, although from the beginning they agreed to be husband and wife and constantly claimed and held themselves out to the world to be married to each other.

In *Floyd* v. *Calvert,* 53 Miss. 37, and in *Rundle* v. *Pegram,* 49 Miss. 751, it was held that Constitution 1869, article, 12, section 22, providing that persons living together as husband and wife at the time of the adoption of the Constitution should to be held to be husband and wife; that this section does not impose a marriage upon anyone except those who are willing and consenting to and actually cohabiting in the relation of husband and wife and accepting and recognizing each other as husband and wife. It did not intend to sanctify the marriage relation between a man and woman because they were cohabiting together as man and wife, although such living together may have extended through many years, and although it may have been public and no-

torious, unless the parties intended, and in some mode distinct and cognizable, accetped the Constitution as legalizing the relation. To change an adulterous intercourse into the state of matrimony requires something more to give expression of the acceptance and consent of the new state than the mere continuance of the intercourse after all difficulties in the way of marriage are removed. Under the laws of this state it takes an agreement between parties competent to agree thereto to constitute marriage, and the law has been fully and well settled in the previous decisions of this state, and it is not necessary to go into foreign jurisdictions and reason out from the conflicting decisions of foreign decisions what the best rule may be. The decisions of this state above cited constitute authority and are binding upon the judges of this court, and a majority of the court as now constituted do not agree to overrule them; consequently they ought to be followed.

The attempted distinction between the case before us and *Thompson* v. *Clay, supra,* is fanciful rather than substantial. In that case it appeared from the agreed statement of facts that Ben Clay legally married Polly Johnson in 1890 and they lived together as man and wife for some years and separated. Polly moved to Sharkey county and lived there until her death, August 29, 1913. In the meantime Ben Clay had married in Washington county to Virginia Clay, and from November 30, 1901, until Ben Clay died in January, 1916, they lived together as man and wife; in other words, after the death of the first wife and after the impediment was fully removed, Ben Clay and Virginia Clay lived together as husband and wife, but the court held that that did not constitute a common-law marriage.

In *Clark* v. *Clark,* 115 Miss. 726, 76 So. 638, this court held that a man already married and not divorced cannot marry another, and a purported marriage between them

is void. In the present case Mrs. Sims knew that she was married, and that her husband was living, and knew that she had never been served with any summons or other process for a divorce and consequently, knew that she was undivorced and was married, and therefore incompetent to marry Sims. The fact that Sims may have acted in good faith in no manner aids her nor helps her attitude in the matter. So far as she was concerned, she entered into the relation knowing its illegality, and could not be acting in good faith. The principle that all persons are presumed to know the law applies to her as well as to other people.

Judges HOLDEN and SYKES agree with me on the two propositions above announced.

There are other reasons, however, appearing from the record, though not raised by counsel, but which go to the validity of the alleged divorce that in my personal opinion avoids the divorce. The other judges do not care to take up and consider this proposition at this time; but, as the chancellor's order is involved, and he has not rendered a final decision in the matter, I desire to call attention to them. It appears from Mrs. Sims' testimony that she was married at Crownpoint, Ind., about 1889 to a man named Perrin, and that he deserted her in Indiana and went over into Illinois. She remained in Indiana until 1893, when she entered into an ostensible marriage with Sims. She says that in 1902 her first husband came to see her and suggested that they get a divorce in order to keep matters straight, he to pay the expense thereof, to which she agreed, and that she went with him to Chicago and filed a proceeding in divorce and got a decree, which was introduced in evidence in the case. In this decree her first husband, Perrin, was defendant, and she was complainant. It was obtained by them agreeing with each other that a divorce should be procured, and the defendant paid the expense thereof. It was a patent fraud upon the

court, and was a collusive divorce, which renders it void. While it does not appear with definite certainty where Mrs. Sims lived at that time, I think a fair construction of the record warrants the conclusion that she lived in Indiana, and certain it is that the alleged grounds of divorce accrued in Indiana. In Starr & Curtis' Annotated Statutes of Illinois, p. 888, a venue of divorce proceeding provided in paragraph 5 reads as follows:

"The proceedings shall be had in the county where the complainant resides, but process may be directed to any county in the state."

Paragraph 2, same page, reads as follows: "No person shall be entitled to a divorce in pursuance of the provisions of this act, who has not resided in the state one whole year next before filing his or her bill or petition, unless the offense or injury complained of was committed within this state, or whilst one or both of the parties resided in this state."

This statute has been held by the Illinois supreme court to be jurisdictional. *Spangler* v. *Spangler,* 19 Ill. App. 28; *Albee* v. *Albee,* 43 Ill. App. 370; *People* v. *Beattie,* 137 Ill. 553 (27 N. E. 1096, 31 Am. St. Rep. 384). In the sixth syllabus to this last decision the rule is stated as follows:

"Where a wife seeks a divorce from her husband in this state for cruelty or desertion committed outside of this state, she must show that she has resided in the state one whole year next before the filing of the bill. Without the jurisdictional fact—one year's residence in the state—all proof of cruelty or desertion in another state becomes wholly immaterial and worthless."

Quoting the statute above set out at page 569 of 137 Ill., at page 1101 of 27 N. E. (31 Am. St. Rep. 384), the court says:

"Therefore, where a wife seeks a divorce from her husband in Illinois for act of cruelty which have been

committed outside of this state, or for desertion which
has taken place outside of this state, she will not be en-
titled to the divorce, unless she shows, either that she
had resided in the state one whole year next before filing
her bill, or that her husband was guilty of such cruelty
or desertion while he or she of both of them resided in
Illinois."

In *Hamilton* v. *Hamilton,* 89 Ill. 349, the court held a
contract void made between husband and wife in settle-
ment of alimony though there was no agreement that
there would be no defense to the suit; the court stating
that it would encourage collusion, and that divorce could
not be granted under the laws of that state where there
was collusion between the parties.  So also *Danforth* v.
*Danforth,* 105 Ill. 603, *People* v. *Case,* 241 Ill. 279, 89
N. E. 638, 25 L. R. A. (N. S.) 578, and *Belz* v. *Belz,* 33
Ill. App. 105, where the same doctrine is announced.

It further appears from the bill and the testimony in
this case that the parties moved to Mississippi after the
alleged divorce in Illinois and prior to the amendment
to the Code in 1906.  The wife testified that she lived in
Meridian about twelve years, and that she had moved
from Meridian about two years prior to the time of
the trial, and the plaintiff's bill showing that they moved
to the city about fourteen years before the filing of the
bill, which was filed October 9, 1919, which would make
the removal be in October, 1905.